**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **VINCENT THEODORE DAMICO** | |
| *Plaintiff,* | **CIVIL ACTION** |
| **v.** | **NO. 14-06091** |
| **HARRAH'S PHILADELPHIA CASINO & RACETRACK a/k/a CHESTER DOWNS AND MARINA, LLC, et al.** | |
| *Defendants.* | |

**PAPPERT, J.**                                                    **FEBRUARY 23, 2016**

<u>**MEMORANDUM**</u>

On November 4, 2012, Vincent Damico ("Damico") visited Harrah's Philadelphia Casino & Racetrack a/k/a Chester Downs and Marina, LLC ("Harrah's" or "Casino") with his common law wife, Victoria Goscicki ("Goscicki"). Harrah's employees detained Goscicki when they believed she attempted to exchange counterfeit bills at the Casino's money window. Harrah's employees then located Damico and brought him to where Goscicki was being held to wait for the Pennsylvania State Police ("PSP") to arrive. PSP Trooper Ryan Buch ("Buch") investigated the incident. He spoke with Damico, Goscicki and the supervisor who witnessed Goscicki's attempt to exchange the bills. He then queried certain bills in Damico and Goscicki's possession through a Secret Service website, which confirmed that they were "known counterfeits." Buch arrested Damico and Goscicki for forgery and conspiracy to commit forgery, though those charges were eventually withdrawn after it was later established that the bills were in fact not counterfeit.

Damico filed this lawsuit against Harrah's and Buch alleging claims of: (Count 1) "arrest;" (Count 2) "detention and confinement;" (Count 3) "strip search;" (Count 4)

1

"conspiracy;" (Count 5) "refusing or neglecting to prevent" (collectively the "Federal Claims")[1]; (Count 6) malicious prosecution; (Count 7) malicious abuse of process; (Count 8) "violation of Pennsylvania Civil Rights Act;" (Count 9) false arrest and imprisonment; (Count 10) assault; (Count 11) battery; (Count 12) conspiracy; (Count 13) intentional infliction of emotional distress; (Count 14) negligence; (Count 15) negligent infliction of emotional distress; (Count 16) defamation; (collectively the "State Claims") and (Count 17) "violation of 42 USC 12101 & 12112; Discrimination."  (ECF No. 15.)  Before the Court are Harrah's and Buch's motions for summary judgment.  For the reasons set forth below, the Court grants both motions and dismisses all counts.  The Court exercises its discretion and asserts supplemental jurisdiction in dismissing Damico's State Claims because they are premised on the same issues as his Federal Claims.[2]

## I.      FACTUAL BACKGROUND

On the afternoon of November 4, 2012, Goscicki called Damico and told him that she won $1,800 on a slot machine at the Valley Forge Casino and asked him to pick her up at that location.  (Buch Mot. Summ. J., Ex. 1 ("Damico Dep.") at 68:22–23; 182:1–7.)  Damico left his home at approximately 6 p.m. that evening, picked up Goscicki and drove her to the bank where she deposited a portion of her winnings.  (*Id.* 68:9–69:4.)  The two then decided to go to Harrah's for the evening.  (*Id.* 183:12–16.)  At that point, Goscicki gave Damico $260 and kept approximately $310 for herself to bring to the Casino.  (*Id.* 184:6–10.)

Upon arriving at Harrah's, Damico and Goscicki went to separate areas of the floor to gamble.  (*Id.* 73:21–74:4.)  Damico lost the $260 he brought with him and found Goscicki soon

---

[1]        Damico brings each of the Federal Claims pursuant to 42 U.S.C. § 1983.

[2]        The Court exercises supplemental jurisdiction over the State Law claims upon "considerations of judicial economy, convenience, and fairness to the parties."  *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000).

after. (*Id.* 74:15–75:1.)  She told him that she "just hit for $693" and gave him two $100 bills.

(*Id.* 75:9–11.)  The two returned to the gaming floor and separated again. (*Id.* 76:7–15.)  Damico

used one of the $100 bills to purchase a "ticket" or "coupon" that allowed him to play certain

games. (*Id.* 76:15–18, 77:14–78:8, 91:12–16.)  He retained the other $100 bill. (*Id.* 76:12–18,

118:19–24.)

Approximately 40 minutes after they separated for the second time, a security guard

approached Damico while he was gambling and told him that "we have your wife downstairs."

(*Id.* 87:13–14, 88:7, 89:12–13.)  Damico testified that the security officer told him that "you have

to come with me." (*Id.* 89:21–22.)  As they walked downstairs, the security officer told Damico

that Goscicki was being held because she had counterfeit money. (*Id.* 93:3–5.)

Upon seeing his wife in the Casino's security office, Damico asked Goscicki what was

going on and whether she had counterfeit money. (Buch Mot. Summ. J., Ex. 2-B ("Buch

Affidavit of Probable Cause"); Damico Dep. at 97:4–6.)  She told him "yeah, that big guy over

there got it," and pointed to a Harrah's employee who was holding the bill. (*Id.* 97:6–7.)  The

Harrah's employee approached Damico to show him the bill by holding it up to the fluorescent

lights in the ceiling. (*Id.* 98:18–99:4.)  After examining the bill, Damico asked Goscicki: "where

the hell did you get that?  That looks fake.  Right?"[3] (*Id.* 98:2–4.)  She responded that she did

not know.[4] (*Id.* 98:5, 103:19–21.)  Damico testified that portions of the bill looked "funny" when

he examined it, which led him to believe it was fake. (*Id.* 97:22–98:1.)  A Harrah's employee

informed Damico and Goscicki at that point that they were waiting for the state police to arrive.

---

[3]      Damico confirmed in his deposition that he said "it does look fake," (Damico Dep. 100:13–14), and
testified "it looked fake to me, but then again, I'm not an expert." (*Id.* at 168:9–10.)  Damico agreed that believing
the bill was a counterfeit would be a "reasonable conclusion from somebody looking at [it]." (*Id.* 169:9–11.)

[4]      Damico's testimony regarding where this bill came from is contradictory.  Though he testified that Goscicki
told him she did not know where she got it, (*Id.* 98:5, 103:21), he also testified that she told him she got it from the
"kiosk machine" at Harrah's when she won the $693. (*Id.* 101:24.)  The source of the bill is not a material fact for
purposes of resolving the summary judgment motions.

(*Id.* 104:3–5.)  After an approximately 50-minute wait, during which Damico was permitted to take a smoke break, state trooper Ryan Buch arrived at Harrah's.  (*Id.* 112:8–25.)

Buch stated that upon arriving at the Casino, the Cage Supervisor informed him of the events giving rise to the incident.  (Buch Mot. Summ. J., Ex. 2 ¶ 4.)  She informed him that Goscicki attempted to exchange four $100 bills at the main cage on the casino floor.  (*Id.*)  The Cage Supervisor believed one of the bills looked "suspicious and marked it" and "informed Ms. Goscicki that she believed the bill to be counterfeit."  (*Id.* ¶¶ 5–6.)  At that point, Ms. Goscicki allegedly "grabbed the other 100 dollar bills from the Cage Supervisor and attempted to leave the casino."[5]  (*Id.* ¶ 7.)  A Harrah's security guard detained Goscicki and contacted Buch.  (*Id.* ¶ 8.)  Buch then spoke with Goscicki who told him that she was unaware the bills were counterfeit and that she had received them from the Valley Forge Casino.  (*Id.* ¶ 9.)

According to Damico, Buch examined the $100 bill that Damico agreed looked fake.  (*Id.* 115:1–8, 119:6–13.)  He told Damico that "the bill is counterfeit."  (*Id.* 115:8.)  Buch then asked Goscicki and Damico if they had other $100 bills.  (*Id.* 118:2–119:5.)  He briefly inspected three $100 bills that Goscicki handed him and one $100 bill Damico gave him.  (*Id.* 117:2–5, 118:1–119:5.)  Buch "noticed that [the bills] were suspect," (Buch Affidavit of Probable Cause), and asked to take them so that he could inspect them further.  (Damico Dep. 121:19–25.)  Damico confirmed for Buch that he received two of the $100 bills from Goscicki "from the money she received from the Valley Forge [Casino]."  (Buch Mot. Summ. J., Ex. 2 ("Buch Declaration") ¶ 10.)

---

[5]       An "Incident File Full Report" (the "Incident Report") completed by a Harrah's employee at the time of the incident and recounting the events giving rise to the arrest states that after unsuccessfully attempting to exchange the money at the Main Cage, "[p]atron refuse[d] to give up the other $100 bills to Main Bank."  (Harrah's Mot. Summ. J., Ex. C.)

Buch then "queried them through the US Secret Service US Dollar Note search website and all five (5) $100 bills came back as known counterfeits." (Buch Affidavit of Probable Cause.) According to Damico, Buch returned to the room where they were waiting and told them that the bills were indeed counterfeit. (Damico Dep. 122:5–7.) Buch first took Goscicki back into a separate police office, and then approached Damico and read him his Miranda rights. (*Id.* 124:10–125:11.) Buch then took Damico into the separate office and sat him on a bench next to Goscicki. (*Id.* 125:13–15.) Buch charged Goscicki and Damico with forgery and conspiracy to commit forgery "[b]ased upon the reports from the Secret Service website that the bills were know[n] counterfeits, that Ms. Goscicki stated that she gave Mr. D'Amico the money and that when she was informed that the money was suspected as counterfeit she grabbed the money from the cage supervisor and tried to leave the casino[.]" (Buch Declaration ¶ 17.)

An officer from the Chester Police Department came to Harrah's, picked up Damico and Goscicki and drove them to a holding cell. (Damico Dep. 130:21–131:19.) Damico and Goscicki were held at the Chester Police Department until the following day, November 5, 2012, when they appeared before a judge. (*Id.* 146:24–147:6.) At that time, they were charged with five counts of forgery and conspiracy and subsequently released on $50,000 unsecured bail.[6] (*Id.* 150:10–24.) On January 8, 2013, the counterfeit charges against them were withdrawn. (*Id.* 155:4–7.)

## II.    PROCEDURAL HISTORY

On November 4, 2014, Damico filed an amended complaint asserting claims under 42 U.S.C. § 1983 and Pennsylvania state law against Harrah's, Buch in his official and individual

---

[6]    Damico admitted that he does not have any "facts or evidence that would suggest that Harrah's participated in any way in the decision to put [him] in a holding cell" or in the "custody of the Chester Police Department." (Damico Dep. 130:2–13, 131:20–132:1.) Damico also admitted that he does not have any "facts or evidence that would suggest that Harrah's was involved in the decision to charge [him] with any of the five counts." (*Id.* at 151:20–23.)

5

capacities, the PSP, and the Pennsylvania State Gaming Board (the "Gaming Board").  (ECF No. 2.)  The Court dismissed Damico's claims against the PSP with prejudice, finding them barred by the Eleventh Amendment.  (ECF No. 12.)  It also dismissed Damico's federal law claims against Harrah's, holding that the facts alleged in the complaint failed to state a plausible claim that Harrah's was liable pursuant to 42 U.S.C. § 1983.  (*Id*.)  The Court, however, granted Damico leave to amend so he could attempt to state a plausible Section 1983 claim against Harrah's. (*Id*.)

The Court also ordered Damico to show cause why his claims against the Gaming Board and Buch in his official capacity should not be dismissed on Eleventh Amendment grounds as well.  (*Id.*)  Damico, however, never filed the requested briefing and instead filed a Second Amended Complaint on March 20, 2015.  (ECF No. 15.)  On April 17, 2015, the Court dismissed with prejudice Damico's claims against the PSP, the Gaming Board and Buch in his official capacity.  (ECF No. 18.)

On November 2, 2015, Harrah's and Buch each filed a motion for summary judgment (the "Motions").  (ECF Nos. 27, 28.)  Buch contends that he had probable cause to arrest Damico and qualified immunity therefore shields him from Damico's Federal Claims.  (Buch Mot. Summ. J. at 13–18, ECF No. 27.)  He also argues that sovereign immunity bars Damico's state law claims from proceeding because his alleged actions do not fall into any of the nine waivers of immunity.  (*Id.* at 11–12.)  Harrah's contends that Damico's Federal Claims cannot proceed because the Casino employees were not "acting under color of law."  (Harrah's Mot. Summ. J. at 7–10, ECF No. 28.)  It also argues that his State Claims have no merit and must similarly be dismissed.  (*Id.* at 11–23.)  Damico failed to timely respond to either motion.

At a December 22, 2015 pre-trial conference, the Court discussed Damico's failure to respond to the Motions with each of the parties.  All parties agreed that Damico would be given additional time to respond to the Motions.  (ECF No. 41.)  On December 31, 2015, Damico filed his opposition briefs, arguing that a number of issues of material fact remain.  (ECF Nos. 42, 43.)  Specifically, Damico contends that the Harrah's employees were "acting under color of law" (Opp. Harrah's Mot. Summ. J. at 5–10), and that Buch is not protected by qualified immunity because he did not have probable cause to arrest Damico and he violated a right that is clearly established.  (Opp. Buch Mot. Summ. J. at 5–11.)[7]  Damico's opposition briefs, however, are deficient in a number of respects.  He does not provide a "paragraph-by-paragraph response to the statement of material facts, setting forth which facts [he] contends there is a genuine issue to be tried," as required by the Court.[8]  He also does not cite to any deposition testimony or other record evidence in either of his opposition briefs, with the exception of a small number of references to documents attached to the complaint.  In fact, it does not appear as though Damico has undertaken any discovery at all, including taking any depositions or seeking any documents during discovery from Harrah's or Buch.  He lists without support what he perceives as the "undisputable facts" and "material facts in dispute."  (*See, e.g.*, Opp. Buch Mot. Summ. J. at 2–4.)  The remaining "analysis" consists of paragraphs without any support from the record, sweeping allegations and conclusory statements.[9]  The Court has nevertheless thoroughly reviewed the record to determine if any disputed issues of material fact exist.

---

[7]        Damico did not include page numbers on his opposition briefs.  The Court therefore includes citations to specific page numbers based on its own numbering of the pages.

[8]        *See* https://www.paed.uscourts.gov/documents/procedures/pappol.pdf.

[9]        For example, Damico's brief in opposition to Buch's summary judgment motion states, without citation: "There was no probable cause to arrest the plaintiff in this case as the complaint itself was fabricated from the beginning.  Defendant Harrah's own investigative reports and surveillance tape conforms [sic] that the money at issue came from NRT#5 machine at their own premises. . . .  Mrs. Damico never fled but rather got frustrated when they will not verify [sic] her reasonable inquiry as to why the money it first produced would not be accepted at its

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).  Summary judgment is granted where there is insufficient record evidence for a reasonable factfinder to find for the plaintiff.  *Id*. at 252.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

When ruling on a motion for summary judgment, the Court may only rely on admissible evidence.  *See, e.g., Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 95 (3d Cir. 1999).  A Court must view the facts and draw all reasonable inferences in favor of the nonmoving party. *See In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004).  However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."  *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).  The party asserting a fact "must support the assertion by . . . citing to particular parts of material in the record . . . ."  Fed. R. Civ. P. 56(c)(1)(A).

### IV.    FEDERAL CLAIMS AGAINST BUCH

To overcome Buch's qualified immunity, Damico must demonstrate that Buch violated a constitutional right *and* show that the right was clearly established.  *See Bayer v. Monroe County Children & Youth Servs.*, 577 F.3d 186, 191 (3d Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194,

---

own other machines [sic].  It is clear either the Security Supervisor provided intentionally fabricated information or Officer Buch fabricated the facts on the Probable Cause Statement."  (Opp. Buch Mot. Summ. J. at 6.)

201 (2001)).  If Buch's conduct did not violate a constitutional right, then he has qualified immunity and it is not necessary to analyze whether the right was "clearly established."  Here, Damico alleges that Buch committed five constitutional violations: "arrest," "detention and confinement," "strip search," "conspiracy" and "refusing or neglecting to prevent."  (ECF No. 15.)  The viability of each of those claims rest on the existence or lack of probable cause for Damico's arrest.[10]

The Fourth Amendment prohibits a police officer from arresting a citizen without probable cause.  *See Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995) (citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 169 (1972)).  The test for an arrest without probable cause is an objective one, based on "the facts available to the officers at the moment of arrest."  *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994) (quoting *Beck v. Ohio*, 379 U.S. 89, 96 (1964)).  "In assessing the presence of probable cause, a court must determine the fact pattern the officer encountered and, in light of that, whether the arresting officer had probable cause to believe that a criminal offense has been or is being committed."  *Snell v. City of York*, 564 F.3d 659, 671 (3d Cir. 2009) (quoting *Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997)) (internal quotation marks omitted).  Courts apply a common sense approach based on the totality of the circumstances.  *See Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000).

Buch believed he had probable cause to arrest Damico for forgery and conspiracy to commit forgery "[b]ased upon the reports from the Secret Service website that the bills were know[n] counterfeits, that Ms. Goscicki stated that she gave Mr. D'Amico the money and that when she was informed that the money was suspected as counterfeit she grabbed the money from

---

[10]     Damico's Section 1983 and Section 1985 conspiracy claims are also addressed in Section VII, *infra*.

the cage supervisor and tried to leave the casino[.]"[11]   (Buch Declaration ¶ 17.)  Damico also confirmed for Buch that he received two of the $100 bills from Goscicki "from the money she received from the Valley Forge [Casino]."  (Buch Declaration ¶ 10.)  Further, by Damico's own admission, at least one of the bills looked fake, (Damico Dep. 98:2–4, 100:13–14, 169:9–11), and he agreed that believing the bill was a counterfeit would be a "reasonable conclusion from somebody looking at [it]."  (*Id.* 169:9–11.)  Based on these facts, Buch had probable cause to arrest Damico for forgery and/or conspiracy to commit forgery.[12]  To require more in this situation would hold Buch to the near impossible standard of determining not just whether he had probable cause to arrest, but also determining whether Damico was in fact guilty or innocent of forgery or conspiracy to commit forgery.  *See Potts v. City of Philadelphia*, 224 F. Supp. 2d 919, 934 (E.D. Pa. 2002) ("A police officer, after all, is not obligated 'to conduct a mini-trial' before arresting a suspect.").

Damico contends that the Secret Service website reports cannot be the basis of probable cause because they were "fabricated and produced to [corroborate] the defective probable cause statement to seize the Plaintiff."  (Opp. Buch Mot. Summ. J. at 7.)  Damico's claim, however, is nothing short of pure speculation that levies a serious, unfounded claim against Buch for falsifying records.  It is not supported by any facts in the record and is indeed directly contrary to

---

[11]     Under Pennsylvania law, a person is guilty of forgery if, with the intent to defraud, or with knowledge that he is facilitating a fraud, he "alters any writing of another without his authority."  18 Pa. Const. Stat. § 4101(a).  As used in the statute, a "writing" may "include[ ] printing or any other method of recording information, money, coins, tokens, stamps, seals, credit cards, badges, trademarks, electronic signatures and other symbols of value, right, privilege, or identification."  18 Pa. Const. Stat. § 4101(b).  The statute encompasses counterfeit money and was drafted to focus the offense upon falsity as to genuineness or authenticity rather than merely the falsity of any statement contained in a legitimate document.  14 West's Pa. Prac., Crim. Offenses & Defenses § 1:372 (6th ed.).

[12]     Even if Buch did not have probable cause to arrest Damico—which he indeed had—he would still be protected by qualified immunity because the right was not "clearly established."  To be "clearly established," a court must conclude that "every reasonable official would have understood that what he is doing violates that right."  *Ashcroft v. Al-Kidd*, 131 S.Ct. 2074, 2083 (2011).  In light of the significant evidence suggesting that the bills were counterfeit, and given the admission that Goscicki gave Damico two of these bills, it cannot be said that "every reasonable official would have understood" that probable cause did not exist to arrest Damico and Goscicki for forgery and conspiracy to commit forgery.  *Id.*

Buch's Affidavit of Probable Cause, which states that he queried the Secret Service website in the early morning hours of November 5, 2012 prior to arresting Damico and Goscicki.[13]  (Buch Affidavit of Probable Cause.)

Buch rightly relied upon this information in assessing whether he had probable cause to arrest Damico: the web reports came from the Secret Service dollar note website, which indicated that the specific bills in Damico and Goscicki's possession were counterfeit.  This is the type of information that an officer may use in establishing probable cause to arrest.  *See United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002) (quoting *Beck*, 379 U.S. at 91) ("Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested."); *see also Com. v. Riley*, 425 A.2d 813, 816 (Pa. Super. Ct. 1981) ("Although the arrest was indeed made in reliance upon the misinformation from the [National Crime Information Center], the arresting officer did not know, and could not reasonably be expected to have known, that the information was wrong when he made the arrest.").  Buch queried each bill by using its unique serial number, and the report provided him, from all accounts, with specific information that each individual bill was a "known counterfeit."  (Buch Mot. Summ. J., Ex. 2-A.)  That these reports ended up being inaccurate does not alter the probable cause analysis.  *See Wright v. City of Philadelphia*, 409 F.3d 595, 603 (3d Cir. 2005) ("[T]he standard does not require that officers correctly resolve conflicting evidence or that their determinations of credibility, were, in retrospect, accurate.").

---

[13]     Buch's Affidavit of Probable Cause states that he arrived at Harrah's on November 5, 2012 at "approximately 2330 hours."  (Buch Affidavit of Probable Cause.)  There is no dispute that the incident occurred on the evening of November 4, 2012, and Buch arrived on the scene sometime around midnight that evening—not on the evening of November 5.  It appears that Buch's reference to the date and time he arrived at the Casino in his Affidavit of Probable Cause is a minor transcription error that is of no consequence to the probable cause analysis.

The information appeared to be not only reliable, but also highly probative of whether Damico and Goscicki had committed forgery.

Buch was also entitled to rely on the statements made by the Cage Supervisor that Goscicki "grabbed the money from [her] and tried to leave the casino" when being told that the bills looked counterfeit.  *See Merkle v. Upper Dublin Sch. Dist.,* 211 F.3d 782, 790–91 n.8 (3d Cir. 2000) (internal citations omitted) ("[Officer] was not required to undertake an exhaustive investigation in order to validate the probable cause that, in his mind, already existed.")  There is no indication that the Cage Supervisor was unreliable, had any reason to lie about the interaction with Goscicki, or provided inconsistent accounts of the interaction.  To the contrary, the Incident Report completed by a Harrah's employee at the time of the occurrence is consistent with the Cage Supervisor's account, stating that the "[p]atron refuse[d] to give up the other $100 bills to Main Bank."  (Harrah's Mot. Summ. J., Ex. C.)

Damico claims that this information cannot serve as the basis of a finding of probable cause because, as a matter of fact, Goscicki "never fled but rather got frustrated when they [would] not verify her reasonable inquiry as to why the money it first produced would not be accepted at its own other machines."  (Opp. Buch Mot. Summ. J. at 6.)  Aside from Damico's failure to cite any record evidence supporting this claim, it is irrelevant to whether Buch had probable cause to arrest Damico.  The lens through which a court evaluates the existence of probable cause is "the facts available to the officers at the moment of arrest."  *Barna*, 42 F.3d at 819.  Here, the facts provided to Buch upon arriving on the scene were that Goscicki attempted to flee when informed that the bills looked counterfeit.  Since the only relevant facts in evaluating probable cause are those known by the officer at the time, whether Goscicki, as a

matter of fact, fled or merely became frustrated with the Cage Supervisor during the attempted transaction is of no relevance to the probable cause analysis.

## V.    STATE LAW CLAIMS AGAINST BUCH

Damico also asserts claims against Buch for malicious prosecution, malicious abuse of process, assault, battery, intentional and negligent infliction of emotional distress and defamation under Pennsylvania law.  (ECF No. 15.)  Article I, § 11 of the Pennsylvania Constitution states, in part, that "[s]uits may be brought against the Commonwealth in such manner, in such courts and in such case as the legislature may by law direct."  The Pennsylvania Supreme Court has stated that "the Framers intended that the legislature have complete control over suits brought against the Commonwealth."  *Smith v. City of Philadelphia*, 512 Pa. 129, 134 (Pa. 1986).

The Pennsylvania General Assembly has affirmed the sovereign immunity of the Commonwealth and its officials and employees, acting within the scope of their employment, except where it has explicitly waived the immunity.  1 Pa. Const. Stat. § 2310; *see also E-Z Parks, Inc. v. Philadelphia Parking Auth.*, 532 A.2d 1272, 1276 (Pa. Commw. Ct. 1987) ("1 Pa.C.S. § 2310 is the legislature's proclamation that sovereign immunity is the constitutional rule.").  "Sovereign immunity applies to intentional and negligent torts."  *Dill v. Oslick*, No. 97–6753, 1999 WL 508675, at *4 (E.D. Pa. July 19, 1999) (quoting *Pierce v. Montgomery County Opportunity Bd., Inc.*, 884 F. Supp. 965, 972 (E.D. Pa. 1995)).

Here, sovereign immunity shields Buch from liability against Damico's state law claims because he was acting within the scope of his employment and his conduct does not fall within one of the nine exceptions to immunity.  Under Pennsylvania law, an action falls within the scope of employment for purposes of sovereign immunity if it: (1) is the kind that employee is employed to perform; (2) occurs substantially within the job's authorized time and space limits;

(3) is motivated at least in part by a desire to serve the employer; and (4) if force was used by employee against another, the use of force is not unexpectable by employer.  *See Wesley v. Hollis*, No. 03–3130, 2007 WL 1655483, at *14 (E.D. Pa. June 6, 2007).  "Clearly, when a police officer arrests an accused on criminal charges, the officer is engaging in an activity of the kind and nature he is employed to perform."  *Schell v. Guth*, 88 A.3d 1053, 1069 (Pa. Commw. Ct. 2014); *see also La Frankie v. Miklich*, 618 A.2d 1145, 1149 (Pa. Commw. Ct. 1992) (holding that State trooper was acting within scope of his duties, and thus protected by sovereign immunity, when he arrested plaintiff and initiated prosecution for unlawful use of credit card and forgery).  Buch, a state trooper who was "assigned to the Bureau of Gaming Enforcement at Harrah's Chester Downs," was undoubtedly performing acts within the scope of his employment when he arrested Damico and Goscicki.

Buch's conduct also does not fall within any of the nine categories of negligence where the General Assembly has determined that sovereign immunity does not apply: (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody or control of animals; (7) liquor store sales; (8) National Guard activities; and (9) toxoids and vaccines.  42 Pa. Const. Stat. § 8522(b).  None of Damico's state law claims, which are premised on his arrest, fit into any of these nine exceptions.  Indeed, Damico has not attempted in his opposition brief to argue to the contrary.  Absent a waiver, and given that Buch's conduct was within the scope of his employment as a police officer, sovereign immunity shields him from liability on each of Damico's State Claims.

## VI.   FEDERAL CLAIMS AGAINST HARRAH'S

Damico asserts the same five Federal Claims against Harrah's as against Buch.  (ECF No. 15.)  Section 1983 "provides a remedy for deprivations of rights secured by the Constitution and the laws of the United States when that deprivation takes place 'under the color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.'"  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982) (quoting 42 U.S.C. § 1983).  "The initial inquiry in a section 1983 suit is (1) whether the conduct complained of was committed by a person acting under the color of state law and (2) whether the conduct deprived the complainant of rights secured under the Constitution or federal law."  *Sameric Corp. of Del., Inc. v. City of Philadelphia*, 142 F.3d 582, 590 (3d Cir. 1998).  A private actor such as Harrah's is only liable under Section 1983 if it "may fairly be said to be a state actor."  *Lugar*, 457 U.S. at 937; *see also Cahill ex rel. L.C. v. Live Nation*, 512 F. App'x 227, 230 (3d Cir. 2013).

The Third Circuit Court of Appeals has outlined three broad tests to determine whether a party is a state actor: "(1) whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state; (2) whether the private party has acted with the help of or in concert with state officials; and (3) whether the state has so far insinuated itself into a position of interdependence with the acting party that it must be recognized as a joint participant in the challenged activity."  *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1142 (3d Cir. 1995)) (internal quotation marks omitted).  "Regardless of the test employed, the inquiry must be fact specific."  *Cahill*, 512 F. App'x at 230.  Additionally, to sustain a Section 1983 claim against a corporate defendant such as Harrah's, Damico must also demonstrate that that the alleged conspiracy was the result of a Casino custom or policy.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  "It is well established

that a municipality cannot be held liable in a Section 1983 action under a theory of respondeat superior." *See Gallagher v. Green*, No. 12-3840, 2014 WL 4954833, at *8 (E.D. Pa. Oct. 2, 2014) (citing *Monell*, 436 U.S. at 691).

Damico argues that Harrah's employees were acting under color of law because they "assisted Defendant Buch in arresting plaintiff and his wife in this case as the complaint itself was fabricated from the beginning." (Opp. Harrah's Mot. Summ. J. at 6–7.) He states that "[a] reasonable person can infer . . . that either Harrah's employees in the scope of working under the supervision of state officers conducted its initial search on November 4, 2012 or that it was fabricated and produced to [corroborate] the defective probable cause statement to seize the Plaintiff." (Opp. Harrah's Mot. Summ. J. at 8.) In essence, Damico's argument rests on two theories of liability: (1) that the Casino employees exercised powers that are traditionally reserved to the police; and/or (2) that the Casino employees and the PSP concocted a story and acted in a "concerted unlawful" manner to arrest Damico and Goscicki. (*See* ECF No. 15.) Though Damico does not explicitly state which state actor test he is pursuing, his arguments are most closely aligned with the "close nexus" test, *i.e.*, that Harrah's employees were exercising powers traditionally held by the state, and the "joint action" test, *i.e.*, that Harrah's acted with the help or in concert with state officials. *See Pugh v. Downs*, 641 F. Supp. 2d 468, 472 (E.D. Pa. 2009).

Damico's claims fail under both theories. Under the "close nexus" test, the inquiry is whether "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* (citing *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)); *see also Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999) ( "Whether . . . a [sufficiently] close nexus exists . . . depends

16

on whether the State has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." (citations omitted)).   "[G]enerally merchants are not considered to be acting under the color of law for the purposes of 1983 when they detain a person suspected of shoplifting or other crimes, call the police, or make a citizen's arrest."   *Caswell v. BJ's Wholesale Co.*, 5 F. Supp. 2d 312, 318 (E.D. Pa. 1998) (citation omitted).   Here, there are no facts in the record to suggest that the police exercised any degree of control over the Casino's employees, or that "the police substituted the judgment of [Harrah's] for their own official authority."   *Cruz v. Donnelly*, 727 F. Supp. 79, 80 (3d Cir. 1984).   To the contrary, the record reveals that the Harrah's employees genuinely suspected that Goscicki was in possession of counterfeit money and attempting to defraud the Casino by trading them for real bills.   At that point, a Casino employee promptly contacted the police and Harrah's security detained both Goscicki and Damico until Buch arrived.   These facts do not give rise to any inference that the Harrah's employees were "acting under color of law" as used in Section 1983 and as interpreted by courts in this Circuit.

Damico's Federal Claims against Harrah's similarly fail under the "joint action" test. When utilizing this framework, courts examine whether state officials and private parties "acted in concert" in effectuating a deprivation of constitutional rights.   *See, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970) (finding state action where private party and state official conspired to violate plaintiff's equal protection rights).   At summary judgment, Damico must provide "evidence from which one could infer that [Harrah's] and [state officials] had an understanding or agreement to conspire against [Damico]."   *Startzell v. City of Philadelphia,* 533 F.3d 183, 205 (3d Cir. 2008).   A conspiracy requires a "meeting of the minds."   *Id.* (quoting *Adickes*, 398 U.S. at 158).   Damico must provide more than mere suspicion and speculation—he

must offer, by "set[ting] forth specific facts," affirmative "concrete evidence from which a reasonable juror . . . could[ ] disbelieve the defendant's denial of a conspiracy"—and he must do so "even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had a full opportunity to conduct discovery." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986); *see also Romich v. Sears Holding Corp.*, No. 12-5383, 2013 WL 5925082, at *13 (E.D. Pa. Nov. 5, 2013).

There is nothing in the record to suggest that Harrah's and the PSP engaged in a conspiracy to arrest Damico and Goscicki. Damico admitted that he does not have any "facts or evidence that would suggest that Harrah's was involved in the decision to charge [him] with any of the five counts." (Damico Dep. 151:20–23.) Though Damico alleges that the Cage Supervisor fabricated her account of Goscicki attempting to flee and/or Buch fabricated facts in drafting his Affidavit of Probable Cause, (Opp. Harrah's Mot. Summ. J. at 7), there is nothing in the record to indicate that this was anything other than a genuine police response to investigate potentially counterfeit bills. The record suggests as much: the Casino's Incident Report is consistent with the Cage Supervisor's account; the Cage Supervisor, Buch, and Damico himself are all in agreement that at least one bill did in fact look "fake;" and Buch queried the bills through the Secret Service website in an attempt to determine the authenticity of the bills prior to making the arrest.[14] Damico fails to cite to any evidence supporting his conspiracy theory— presumably because it is undermined by much of the record, including his own deposition testimony. Even if he did, he has not demonstrated that these actions were pursuant to a Casino

---

[14]   Damico refers to the presence of a reference to November 27, 2012 on each one of the Secret Service reports as an indication that Harrah's and Buch fabricated the story and created the web reports after the fact. While creative, Damico neglects to address the multitude of reasons why such a stamp may appear on these reports—such as showing the date on which the report was retrieved by officers—or explain how the presence of November 4, 2012 on each of the reports as the "date received" fits with his theory.

policy or custom.  Without any evidence to suggest that the Casino was "acting under color of law," Damico's Federal Claims against Harrah's fail.[15]

## VII.   DAMICO'S CONSPIRACY CLAIMS AGAINST HARRAH'S AND BUCH

For these same reasons, Damico also cannot sustain a claim of common law conspiracy against Harrah's, which is premised on substantially similar law.  *See McKeeman v. Corestates Bank*, N.A., 751 A.2d 655, 660 (Pa. Super. Ct. 2000) ("In order to state a civil action for conspiracy, a complaint must allege (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage.") (internal citation omitted).

His Section 1983 and 1985 conspiracy claims against Buch also fail.  Essential to both of these claims are facts sufficient to indicate the existence of a conspiracy.  *See Marchese v. Umstead*, 110 F. Supp. 2d 361, 371 (E.D. Pa. 2000) (stating that a plaintiff must demonstrate "the existence of a conspiracy involving state action," among other elements, in order to sustain a Section 1983 conspiracy claim); *see also Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997), *as amended* (May 15, 1997) (stating that the first element in a Section 1985(3) claim is the existence of a conspiracy).  Damico has not only failed to advance facts to suggest that the PSP and Harrah's were conspiring to deprive him of his rights, but also has failed to demonstrate an underlying violation of his rights—*i.e.*, that he was arrested without probable cause.  *See, e.g.*, *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 504–06 (3d Cir. 2000) ("In light of

---

[15]     Damico also asserts a cause of action against Harrah's in Count 8 pursuant to the "Pennsylvania Civil Rights Act."  (Second Am. Compl. ¶¶ 107–12.)  It is unclear, however, to which statute Damico is referring as no law with that title exists.  Regardless, Damico states in this Count that "under color of state, [his] liberty was threatened, and he was intimidated and coerced into not enforcing his right to visit public recreational areas."  (*Id.* ¶ 110.)  Since Harrah's was not "acting under color of law," this particular claim against the Casino must fail as well.

the jury's finding that the underlying tort did not occur, we conclude that the civil conspiracy claim can not survive.").

## VIII.   STATE CLAIMS AGAINST HARRAH'S

Damico asserts claims against Harrah's for malicious prosecution, malicious abuse of process, false arrest and imprisonment,[16] assault, battery, conspiracy, negligent and intentional infliction of emotional distress and defamation.[17]   There are no facts in the record to support these claims.

### a.   Malicious Prosecution and Malicious Abuse of Process

In Pennsylvania, to sustain a claim for malicious prosecution a plaintiff must prove that defendant: (1) instituted the proceedings; (2) without probable cause; (3) with actual malice; and (4) that the proceedings terminated in favor of the plaintiff.   *Bradley v. General Accident Ins. Co.*, 778 A.2d 707, 710 (Pa. Super. Ct. 2001).   The Second Restatement, which has guided the development of Pennsylvania common law of malicious prosecution, *see id.* at 710–11, provides that merely "giving the information or even making an accusation of criminal misconduct [to an officer] does not constitute a procurement of the proceedings initiated by the officer if it is left

---

[16]     False arrest or imprisonment occurs when a person has been arrested or restrained without legal justification.  *See Gilbert v. Feld*, 788 F. Supp. 854, 862 (E.D. Pa. 1992).  A finding of probable cause for an arrest will defeat actions for both false arrest and false imprisonment.  *See Gilbert v. Feld*, 842 F. Supp. 803, 821 (E.D. Pa. 1993).  Because the record contains sufficient facts to support a finding of probable cause to arrest Damico, his claims for false imprisonment and arrest against both Buch and Harrah's must fail.  Additionally, Damico premises his negligence claim on the false arrest and imprisonment charges: "Defendants . . . owed a duty to supervise or train the officers and to take steps to prevent events such as occurred here, to wit, the false arrest and imprisonment and to charges [sic] without probable cause."  (Second Am. Comp. ¶ 144.)  Without a false arrest or false imprisonment charge, Damico's negligence count also fails.

[17]     Damico alleges in Count 17 a charge of discrimination under the Americans with Disabilities Act, 42 U.S.C. §§ 12101, 12112.  The ADA prohibits "employers from discriminating against any qualified individual with a disability on the basis of their disability."  *Dogmanits v. Capital Blue Cross*, 413 F. Supp. 2d 452, 457–58 (E.D. Pa. 2005) (internal citation omitted).  To make a prima facie showing of discrimination, a plaintiff must show: (1) he is disabled; (2) he is a "qualified individual;" and (3) he suffered an adverse employment action because of that disability.  *Id.* at 458.  Damico never contends he is disabled.  In addition, there are no facts in the record to indicate that Damico served as an employee of either Harrah's or the PSP, or that he suffered from discrimination.  The Court remains mystified at the inclusion of this count in the complaint and it merits no further discussion.

entirely to his discretion to initiate the proceedings." *Id.* (citing Restatement (Second) of Torts, § 653).

Here, the record contains no facts to suggest that the Harrah's employees did anything beyond providing information to Buch or making an accusation that the bills might be counterfeit. Damico admitted that he does not have any "facts or evidence that would suggest that Harrah's participated in any way in the decision to put [him] in a holding cell" or in the "custody of the Chester Police Department." (Damico Dep. 130:2–13, 131:20–132:1.) He also admitted that he does not have any "facts or evidence that would suggest that Harrah's was involved in the decision to charge [him] with any of the five counts." (*Id.* 151:20–23.) Without a showing that Harrah's initiated the proceedings, Damico cannot sustain a claim for malicious prosecution against the Casino. Even if he could satisfy this first element, however, he cannot satisfy the second—that there was no probable cause for his arrest—for the reasons previously discussed. *See supra* Section IV.

Damico similarly cannot sustain a claim for malicious abuse of process. That claim is defined as "the use of legal process against another 'primarily to accomplish a purpose for which it is not designed.'" *Rosen v. American Bank of Rolla*, 627 A.2d 190, 192 (Pa. Super. Ct. 1993) (quoting Restatement (Second) of Torts, § 682). A party alleging a malicious abuse of process must prove: "(1) an 'abuse' or 'perversion' of process already initiated (2) with some unlawful or ulterior purpose, and (3) harm to the plaintiff as a result." *Kedra v. Nazareth Hosp.*, 473 A.2d 1017, 1019 (Pa. Super. Ct. 1984). "Typical forms of abuse of process include extortion by means of attachment, execution or garnishment, and blackmail by means of arrest or criminal prosecution." *Rosen v. Tesoro Petroleum Corp.*, 582 A.2d 27, 33 (Pa. Super. Ct. 1990), *appeal denied*, 592 A.2d 1303 (Pa. 1991) (citing W. Prosser & W. Keeton, *Prosser and Keeton on Torts*

§ 121 (5th ed. 1984)).  Since there are no facts in the record to indicate that Harrah's was using

Damico's arrest and criminal charge for a perverse or ulterior purpose, or that it played any role

in Buch's decision to charge him, a claim for malicious abuse of process cannot proceed.

   **b.  Assault and Battery**

   Under Pennsylvania common law, assault "is an intentional attempt by force to do an

injury to the person of another, and a battery is committed whenever the violence menaced in an

assault is actually done, though in ever so small a degree, upon the person." *Renk v. City of

Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994).  To prove assault, a plaintiff must show that the

defendant intentionally caused an imminent apprehension of a harmful or offensive bodily

contact. *See Latkis v. York*, 258 F. Supp. 2d 401, 407 (E.D. Pa. 2003).  To prove a claim of

battery, the plaintiff must show that the defendant intended to cause harmful or offensive contact

and that such contact resulted.  *Id.*  A defendant cannot be held liable for assault or battery if "he

was not the principal actor, was not present at the scene . . . and did not otherwise specifically

cause the [assault or battery] to occur." *Id.*

   Damico cannot sustain a claim of either assault or battery.  His deposition testimony

contains the following exchange.

| | |
|---|---|
| *Q*: | During the period of time between the time that you were advised that your wife was downstairs, and the time that you left Harrah's in the custody of the Chester Police Department, did anybody assault you? |
| *Damico*: | Not physically. |
| *Q*: | Did anybody ever touch you? |
| *Damico*: | No. |
| *Q*: | Did anybody threaten you? |
| *Damico*: | No. |
| *Q*: | . . . Did you ever believe, while you were at Harrah's, that you were in jeopardy of suffering some serious bodily injury? |
| *Damico*: | No. |

(Damico Dep. 176:18–177:11.)  There is no basis for the assault and battery claims.

### c.   Negligent and Intentional Infliction of Emotional Distress

In Pennsylvania, "[t]he elements of intentional infliction of emotional distress [ ] are: (1) a person who by extreme and outrageous conduct (2) intentionally or recklessly causes (3) severe emotional distress to another." *Manley v. Fitzgerald*, 997 A.2d 1235, 1241 (Pa. Commw. Ct. 2010).  "In Pennsylvania, '[l]iability on an intentional infliction of emotional distress claim has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Kasper v. County of Bucks*, 514 Fed. Appx. 210, 217 (3d Cir. 2013) (internal citations and quotations omitted).  "A plaintiff seeking to establish intentional infliction of emotional distress must also support his claim with 'competent medical evidence,' because 'it is unwise and unnecessary to permit recovery to be predicated on an inference based on the defendant's 'outrageousness' without expert medical confirmation that the plaintiff actually suffered the claimed distress.'" *Bock v. CVS Pharmacy, Inc.*, No. 07–412, 2008 WL 3834266, at *2 (quoting *Kazatsky v. King David Mem'l Park, Inc.*, A.2d 988, 995 (Pa. 1987)).  "It is appropriate to resolve this dispute via summary judgment because 'it is for the court to determine in the first instance whether the defendant's conduct may reasonably be regarded as so extreme and outrageous [as] to permit recovery.'" *Bock*, 2008 WL 3834266, at *2 (quoting *Johnson v. Caparelli*, 625 A.2d 668, 671 (Pa. Super. Ct. 1993), *appeal denied*, 647 A.2d 511 (Pa. 1994)).  Given the existence of probable cause to arrest Damico and the absence of any facts in the record to implicate Harrah's employees in any material wrongdoing during the course of the incident, Damico cannot maintain a claim of intentional infliction of emotional distress against the Casino.  Further, Damico has not submitted any

"expert medical" evidence to confirm that he actually suffered from the distress as required by Pennsylvania law.

To sustain a claim of negligent infliction of emotion distress, Damico must demonstrate that his claim falls within at least one of four factual situations: (1) the defendant had a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative. *See Toney v. Chester County Hosp.*, 961 A.2d 192, 197–98 (Pa. Super. Ct. 2008) *aff'd*, 36 A.3d 83 (Pa. 2011). "Plaintiffs must also have sustained some bodily harm from the mental disturbance brought on by observation of the event." *Tomasella v. Gen. Motors Corp.*, No. 99-4016, 2002 WL 407185, at *3 (E.D. Pa. Mar. 18, 2002) (internal citations and quotation marks omitted). Aside from Damico's failure to identify which of these four scenarios he is claiming, he fails to advance facts to proceed on any of them. Further, he has failed to produce any evidence to suggest that he has sustained some bodily injury as a consequence of the emotional distress.

### d. Defamation

Damico also brings a claim alleging defamation because "records [of his arrest] remain in public domain [sic]" and he "was humiliated with libelous reports alleging him as a criminal." (Second Am. Comp. ¶¶ 159, 160.) To recover on a defamation claim, Damico must establish: (1) the defamatory character of the communication; (2) its publication by Harrah's; (3) its application to Damico; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to Damico; and (6) either special harm resulting to Damico from its publication or abuse of a conditionally privileged occasion. 42 Pa. Cons. Stat. § 8342. Damico does not specifically identify which "record" or "libelous

report" was defamatory and he cannot establish that Harrah's published any such communication: he acknowledged that none of the Harrah's employees issued or signed the criminal complaint filed against him and that he does not have any "facts or evidence that would suggest that Harrah's was involved in the decision to charge [him] with any of the five counts." (Damico Dep. 151:20–23, 238:5–8, 239:6–15.)  He also acknowledged that "anybody that knows about [his arrest] knows about it because [he] told them."  (*Id.* 171:14–17.)  Even assuming Damico satisfies the publication element, he has not provided any evidence showing that he suffered a special harm as a result.

An appropriate Order follows.

BY THE COURT:


*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.

25